UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PUBLIC JUSTICE FOUNDATION;
ANIMAL LEGAL DEFENSE FUND;
CENTER FOR BIOLOGICAL
DIVERSITY; CENTER FOR FOOD
SAFETY; FOOD & WATER WATCH,

Plaintiffs,

v.

FARM SERVICE AGENCY,

Defendant.

No. C 20-01103 WHA

**ORDER GRANTING MOTION CHALLENGING DEFICIENCIES IN FSA'S REVISED SEARCH AND PRODUCTION**

## INTRODUCTION

In this Freedom of Information Act case, plaintiff advocacy organizations challenge the adequacy of a government agency's search with regard to one FOIA request underlying this case. To the extent stated herein, the motion is granted.

## STATEMENT

Plaintiffs Public Justice Foundation, Animal Legal Defense Fund, Center for Biological Diversity, Center for Food Safety, and Food & Water Watch are advocacy organizations committed to building a more sustainable and ethical food system. To that end, plaintiffs use information requests to monitor compliance with applicable laws, bring to public attention issues within our food system, and advocate for policy change (Compl. ¶¶ 1–2).

Defendant Farm Service Agency, operating within the Department of Agriculture, is responsible for administering direct farm loans to eligible agricultural producers and landowners. These duties, plaintiffs contend, are subject to compliance with the National Environmental Policy Act. Before providing financing for proposed agricultural operations, such as the construction of concentrated animal feeding operations, FSA should then review the proposed project, determine the potential environmental impacts, and conduct further analysis as necessary (Compl. ¶¶ 1–2).

Plaintiffs have sought to monitor FSA's administration of the farm loan program and connected environmental review through FOIA requests. The requests have targeted agency records regarding specific agricultural operations and geographical areas. The requests have also been aimed at uncovering the true extent to which FSA considers environmental impacts before awarding federal farm loans to an applicant and the extent to which FSA oversees the use of the funds after distribution. And, at the heart of this case, plaintiffs collectively submitted a FOIA request for records relating to "FSA's directives and/or policies for responding to and/or processing FOIA requests and appeals" (Compl. ¶¶ 1–2; Decl. Buchan ¶ 7).

Plaintiffs filed this action in February 2020 challenging FSA's alleged pattern and practice of improperly withholding records responsive to plaintiffs' FOIA requests. In particular, the complaint alleges a pattern and practice of withholding responsive records under FOIA Exemptions 3 and 6, demonstrated by eight FOIA requests plaintiffs submitted. The pattern-and-practice claims make up three of plaintiffs' six claims for relief. The other half relate to plaintiffs' collective April 2019 FOIA request regarding FSA's FOIA practices, including alleged failures to make a proper initial determination, conduct an adequate search, and promptly release agency records.

At an initial case management conference, the government offered to re-perform its search and production for the April 2019 request. An order then issued setting a schedule for the government to do so and to file a declaration and *Vaughn* index attesting to the adequacy of the search and the grounds for withholding any documents. The order also provided plaintiffs an opportunity to challenge any remaining deficiencies. Plaintiffs now so move.

The motion is fully briefed. Finding the motion suitable for decision on the papers, no oral argument is necessary.

\*         \*         \*

Plaintiffs' April 2019 FOIA request has now been subjected to two searches, each apparently taking a different approach. Plaintiffs' original request sought (Decl. Buchan ¶ 7):

> From January 1, 2008 to the date that FSA conducts its search, all records mentioning or containing FSA's directives and/or policies for responding to and/or processing FOIA requests and appeals.

The FSA staff member who received the request had been puzzled at first. Given the public availability of FSA's policies, interpretations, and administrative staff manuals, as provided by 5 U.S.C. § 552(a)(2)(B)–(C), such documents would normally not need a FOIA request. As such, FSA phoned plaintiffs to better understand what could be provided in response to the request (Decl. Buchan ¶ 9–10).

Following the call, plaintiffs sent an email seeking to clarify the request, stating that "our request seeks internal agency documents and/or communications relating to how FSA responds to the requests it receives, including all FSA 'directives and/or policies' related to that process" and that they believed the request went "beyond those three main sources of FOIA guidance." Plaintiffs later communicated that they were well aware of FSA handbooks and DOJ guidance, which FSA interpreted as saying that plaintiffs did not request those documents (Decl. Buchan ¶ 11).

A month later, on July 25, plaintiffs sent an email stating (Decl. Buchan ¶ 12):

> We have clarified that we are requesting any internal guidance — formal or otherwise — including (but not limited to) any directives or policies instructing FSA officers to look out for certain requests from certain groups and/or use select exemptions under certain circumstances.

3

FSA conducted its first search pertaining to the April 2019 FOIA request looking for records responsive to the July 25 message. Although the agency provided no information about the method or search terms used in this initial search, the results hewed to a literal reading of plaintiffs' email. "FSA identified one instance where guidance had been provided about a certain kind of request from a certain category of requesters, as described in the requester's message." In litigation pending between a class of corn producers and a corporation, farmers had given permission to their attorneys to receive certain forms the farmers had filed with FSA documenting information about their planting. Thousands of requests flooded in, creating the need for the agency to provide guidance to ensure that the requests were processed consistently. In July 2019, FSA located and produced in full two emails totaling seven pages concerning the agency's guidance and directives regarding the corn litigation. No more documents were produced prior to the commencement of this action in February 2020 (Decl. Buchan ¶¶ 13–15).

After the initial case management conference here, FSA conducted a supplemental search. This time, FSA's search hewed closely to the language of the original request, rather than subsequent communications the agency had with plaintiffs. As described by FSA FOIA Officer Buchan, the agency took a broad view of the FOIA request (Decl. Buchan ¶¶ 16–17):

> FSA carefully considered how best to design an appropriate search. For this new search, the agency out of an abundance of caution took a broad view of the request to ensure that the search would capture the agency's actual directives and policies, which are available on agency websites, including 2-INFO, and also e-mails that were most likely to be responsive because they specifically addressed the subject of the agency's directives and policies.

FSA executed the search in three steps. *First*, the agency searched its online laws and regulations website, the routine repository for FSA policy and handbooks, for all FSA notices concerning FOIA processing. This search identified 265 pages of responsive records, which the agency turned over in full (Decl. Buchan ¶ 17).

*Second*, FSA searched its email system for any emails to or from an FSA employee with the following terms *in the subject line*: "2-Info," "App-70," "FOIA Guidance," "FOIA Policy," "FOIA Directives," "FOIA processing," "processing FOIA requests and appeals," and

"processing FOIA appeals." Attempting to explain the search terms used and their targeting of the subject line, the agency states (Decl. Buchan ¶ 18):

> Lessons learned from the agency's past FOIA search experience had taught that it needed to use search terms such as these and target the subject line of emails in order to ensure that the search would capture records that actually addressed the subjects of the agency directives and policy, as opposed to a more overwhelming mass of irrelevant and unresponsive material that could arise from a less-focused search. In my experience, had the search not been focused on the subject line, but also extended to any other text it would likely have hit upon a multitude of irrelevant material instead of records that actually addressed agency directives or policy. For instance, references to 2-INFO could appear in emails about maintenance of computer servers; FOIA processing is a phrase that might appear in the position description or performance plans of hundreds of FSA employees for whom FOIA processing is one of their responsibilities, but have nothing to do with policy or guidance on processing requests.

The search still turned up 29,830 pages of records, "far more than the several hundred pages that FSA originally anticipated that its new search would find concerning FSA's FOIA directives and procedures" (Decl. Buchan ¶ 18). Eventually, the agency turned over nearly all of the records, but for partial redactions of 153 pages (Dkt. No. 27 Exh. C).

*Third*, FSA searched its "electronic files for FOIA documents," which uncovered a powerpoint training presentation that had been used to train FOIA processors for the agency at the state level, totaling 109 pages, turned over in full (Decl. Buchan ¶ 19).

Six staff members over a combined one-hundred hours conducted an expedited review of the 30,204 pages of responsive documents. FSA originally withheld nearly nine-thousand pages in full pursuant to Exemption 5, released 153 pages in part pursuant to Exemption 6, and released in full 21,085 pages, including all of FSA's directives and policies: FSA's FOIA handbook, 2-INFO, numerous FOIA notices issued during the period covered by the request, and the FOIA powerpoint training presentation. A month later, when FSA filed its *Vaughn* index, the agency discretionarily released the nine-thousand pages previously withheld under Exemption 5, purportedly to avoid litigation over that exemption. The agency thus withheld only the redacted information contained within the 153 pages discussed, pursuant to Exemption 6 (Dkt. No. 27 Exh. C).

Plaintiffs did not challenge the adequacy of FSA's *Vaughn* index "[s]o as to prevent delay on issues not central to the case" — namely, plaintiffs' pattern-and-practice claims (Mot. at 5 n.1).

To vet the search results, plaintiffs attempted to locate documents it had previously identified as responsive, including the seven pages of guidance emails that surfaced during the original search and "discussions within FSA that concern[ed] requests for records" that FSA had previously withheld in response to a June 2016 request submitted by plaintiff Food & Water Watch. Neither the emails nor the discussions fell within the agency's "broad" supplemental search.

## ANALYSIS

The Freedom of Information Act lets us see what our government is up to by "provid[ing] public access to official information 'shielded unnecessarily' from public view and establish[ing] a 'judicially enforceable public right to secure such information from possibly unwilling official hands.'" *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). It "mandates a policy of broad disclosure of government documents." *Church of Scientology of California v. U.S. Dep't of Army*, 611 F.2d 738, 741 (9th Cir. 1979), *overruled on other grounds*, *Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016). Here, plaintiffs challenge only the adequacy of FSA's search.

Under the FOIA, an agency responding to a request must "demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents." *Lahr*, 569 F.3d at 986 (quoting *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985)). "This showing may be made by 'reasonably detailed, nonconclusory affidavits submitted in good faith.'" *Ibid.* "In evaluating the sufficiency of an agency's search, 'the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate.'" *Id.* at 987.

The reasonableness of the search is dependent on the circumstances of the case. "An agency has discretion to conduct a standard search in response to a general request, but it must

revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry. Consequently, the court evaluates the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998) (applied by our court of appeals in *Hamdan v. U.S. Dept. of Justice*, 797 F.3d 759, 771 (9th Cir. 2015)). Significantly, "if a review of the record raises substantial doubt, particularly in view of well-defined requests and positive indications of overlooked materials, summary judgment is inappropriate." *Hamdan*, 797 F.3d at 771.

Here, there is no doubt that the agency's supplemental search uncovered troves of at least nominally relevant documents. But the relevant question is whether the *search* rated adequate, not the results. *Lahr*, 569 F.3d at 987. This order finds that FSA's search was not reasonably calculated to uncover all relevant documents. The agency's declaration attempting to demonstrate the contrary instead raises substantial doubt, abandons the clarifying information it requested of plaintiffs, and fails to account for positive indications of overlooked materials. *See Hamdan*, 797 F.3d at 771.

*First*, the declaration's conclusory reasons for searching the subject line of emails for the chosen search terms only address the avoidance of irrelevant material, rather than demonstrate that the search was reasonably calculated to uncover all relevant documents. The latter is what the government must reasonably show. *Lahr*, 569 F.3d at 986. The declaration explained that the agency had learned it needed to use "search terms such as these" and "target the subject line" of emails to "ensure that the search would capture records that actually addressed the subjects of agency directives and policy, as opposed to a more overwhelming mass of irrelevant and unresponsive material that could arise from a less-focused search." The only possibly nonconclusory point made is that the agency designed the search to avoid capturing irrelevant and unresponsive material, not that it would uncover all relevant emails. Again, the latter is what the agency must prove. *Ibid.*

The only argument the agency makes in support of its search methods are just as conclusory. After detailing the large number of documents the search uncovered, the agency merely states (Opp. at 10):

> The agency's search method thus was reasonably calculated to uncover records responsive to Plaintiff's request, as the Buchan declaration illustrates. *See Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 770–72 (9th Cir. 2015) (affirming summary judgment for Government on "adequacy of the searches" where searching was "reasonably calculated to locate responsive records" and "a reasonable search is what [the plaintiffs] got"). Accordingly, FSA has demonstrated that it conducted a reasonable search for responsive records.

The agency's reliance on *Hamdan* falls short. In *Hamdan*, our court of appeals found that the agency's decision to search multiple "databases, using many variations of the terms suggested by [p]laintiffs to account for spelling or other inconsistencies, was a 'diligent search for . . . documents in the places in which they might be expected to be found.'" *Hamdan*, 797 F.3d at 771–72. The agency here presents no such evidence, apparently resting simply on the number of documents produced. It is the adequacy of the search, however, with which we are mainly concerned, not the results.

*Second*, after spending more than a year clarifying plaintiffs' request, the agency's decision to ignore the clarifying information it sought out and instead to perform the search based on a plain reading of the original request ranked as unreasonable. *Campbell*, 164 F.3d at 28. True, plaintiffs made a general request originally. And plaintiffs' "clarification" of their original request raised as many questions as it answered (Opp. at 3):

> We have clarified that we are requesting any internal guidance — formal or otherwise — including (but not limited to) any directives or policies instructing FSA officers to look out for certain requests from certain groups [*who?*] and/or use select exemptions [*which?*] under certain circumstances [*again, which?*].

But before FSA offered to re-perform its search and production, plaintiffs answered all three questions: The "groups" included plaintiffs or other similar advocacy organizations, FOIA Exemptions 3 and 6 counted as the "exemptions," and the "circumstances" concerned records of FSA's farm loan programs and resulting environmental review. It was in this context,

notably, that FSA offered to re-perform its search "in an effort to reach an agreed-upon approach to resolving this litigation" (Opp. at 4).

The agency's renewed search, however, did not factor in any of the clarifying information it then had. For example, it did not search its records for hits on the plaintiffs' names ("Public Justice Foundation," "Animal Legal Defense Fund," "Center for Biological Diversity," "Center for Food Safety," or "Food & Water Watch"), the two exemptions at issue ("Exemption 3" or "Exemption 6"), or the subject matter ("farm loan program," "NEPA," or "environmental assessment"). Given that plaintiffs sought records pertaining to how the agency responds to plaintiffs' FOIA requests specifically, a reasonable search should have at least searched using plaintiffs' names. Instead, the agency unreasonably designed its search to capture only generally applicable policies.

In response, the agency merely points out that the original request did not include the clarifying information and states plaintiffs should have either drafted their request differently or submitted a new FOIA request. The agency provides no authority explaining why subsequent explanatory information from plaintiffs should not be factored into the scope of the agency's search, no less one the agency itself volunteered to perform anew.

*Finally*, when plaintiffs brought to the agency's attention "positive indications of overlooked materials" in the "re-performed" search, the agency took no steps to address the errors. Those overlooked materials included the only relevant documents the original search uncovered — the emails providing guidance to FSA state and local offices in responding to the flood of FOIA requests related to the corn-producer litigation. These emails better track plaintiffs' flushed-out request for "internal guidance" looking out for "certain requests" from "certain groups" under "certain circumstances." Although the agency could find the emails regarding the corn litigation in its more narrow search, it proffers no reason why it could not do so in the re-performed search. Nor does the agency provide any information regarding the search method or terms used in the initial search. The agency replies simply that it carried out the two searches differently. "[I]f an agency can so easily avoid adversary scrutiny of its

9

search techniques, the Act will inevitably become nugatory." *Founding Church of Scientology of Washington, D.C., Inc. v. National Security Agency*, 610 F.2d 824, 837 (D.C. Cir. 1979).

It bears stating that the agency's obfuscation illustrates the necessity of the FOIA's basic purpose.  Government agencies enjoy an unusually powerful position in FOIA cases, where the facts, the documents, and the reasons for withholding begin (and often stay) completely within the agency's control.  "This lack of knowledge by the party seeking disclosure seriously distorts the traditional adversary nature of our legal system[]." *See Wiener v. F.B.I.*, 943 F.2d 972, 977 (9th Cir. 1991) (citing *Vaughn v. Rosen*, 484 F.2d 820, 824 (D.C. Cir. 1973)).  Recall, among other things, the FOIA affords private citizens the ability to hold the government *to its own rules*.  *See Oregon Nat'l Desert Ass'n v. Locke*, 572 F.3d 610, 614 (9th Cir. 2009).

## CONCLUSION

To the following extent, plaintiffs' motion is granted.  The agency shall please conduct an adequate search and provide a declaration and *Vaughn* Index demonstrating the adequacy of the search and justifying any withholdings, by November 5.  For the parties' guidance, an adequate search should be reasonably calculated to uncover all internal FOIA guidance applicable to plaintiffs, environmental reviews undertaken in connection with FSA's farm loan program, and/or the use of FOIA Exemptions 3 or 6.  Plaintiffs are warned, however, that a search within these parameters will not be viewed as unreasonably narrow.  The Court trusts the parties will work together to ensure any issues are promptly resolved.  A further case management conference is hereby set for November 19.  The parties shall please file the usual joint case management conference by November 12 at noon.

**IT IS SO ORDERED.**

Dated: October 5, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE